Folks who were here earlier, you are the last case of the day. We have been here for a while, however, and we've scheduled your case for a half an hour. We are aware of the multitude of issues in this case, its complexity. We are very familiar with the issues and the record. And as you've probably seen, we will be engaged in a dialogue with you about these issues, but hopefully we'll be able to restrain ourselves well enough, and hopefully you'll follow this as well, that we can complete this within about a half an hour or so. When you approach the bench, if you would identify yourself and tell us who you represent. And may it please the Court. Counsel, my name is Jill Lewis and I represent Joliet Steel & Construction, Inc. in this matter. So Joliet Steel's position in this appeal, as it was in the trial court below, is that by having purchased insurance, pursuant to the parties' contractual agreements, in an amount that exceeded Joliet Steel's pro rata share of liability, Joliet Steel's contribution liability has been satisfied. Now this particular issue specifically has not been addressed by this court or any other district, but it's our position that it is a natural extension of Bracino. While the cases of Bracino and Monocle and Kehoe all involved a factual situation where the insurance purchased actually fully protected the third party plaintiff, the rationale that the court used in those cases applies equally in this case. So here's why. In Bracino and Monocle and Kehoe, the courts looked at the contracts to determine the parties' intent. What did they intend when they purchased the insurance? And in Bracino and Monocle, the courts concluded that the general rule of mutual exculpation applied, and that by having purchased insurance, the bargaining parties agreed that insurance would be looked to solely in the event of loss. And in those cases, that's all that was needed, the insurance. Kehoe also, the insurance fully protected the third party plaintiff, but the court, I think contemplating what might happen in a situation where the insurance wouldn't be enough, went a little bit further in its analysis. And they also looked at the contract to determine the parties' intent, but they thought it was important that in addition to an insurance provision, there was also an indemnity provision. And so the Kehoe court said, well, the insurance provision is going to be deemed to be the first line of protection. Implicitly in their decision is the conclusion that if the insurance is not enough to cover the third party defendant's contribution liability, then the third party plaintiff can seek contribution to whatever is in excess of the insurance policy. Isn't that the Jimmy case as well? Well, then we reach, yeah, the Jimmy case, current search. It's easier to say Jimmy, isn't it? It's easier to say Jimmy. All right, so I'll stick with that. Unfortunately, that case did not involve an apportionment of fault like we have here. The first idea was this. We really need to break these ideas down. There are a lot of ideas here. But you agree Kehoe, that I wrote, somehow anticipated this other idea, and Jimmy. The idea, if there is insurance, but the loss is bigger, is more, then that's not the end of the question. Then we have to move on and deal with what to do with this additional loss, correct? Right. I think the Jimmy case left open what happens when there's an apportionment of liability. Because what does it mean? You know, obviously the big dispute in this case is what did the Jimmy court mean when it said, we're going to allow contribution to the extent of the party's actual loss, that $50,000. Jimmy's loss. Jimmy's loss, that $50,000 or Jimmy's insurer. Obviously, it's our position that, and I think if you look at the court's opinion in the Jimmy case, they recognize that the court in Bursino said that you could not allow the insurance policy to protect a loss, and then contribution on top of that, because otherwise, a third party plaintiff would be obtaining a double recovery for the same loss. Okay. When you look at the contracts in this case, what was the intent of the parties, Joliet, Steele, and Power? And I think it's really clear that there are three contracts that were in effect. You know, Power and the owner, Power and the sub, and then the subs and Joliet, Steele, Waukegan, Steele, and Joliet, Steele. And in all three of those contracts, the insurance provision specifically said that the sub, such as Joliet, Steele, was required to purchase and maintain insurance, but only to the extent that it would cover Power's liability arising out of Joliet, Steele's work. Okay. That specific language was included in each of those contracts, as it was in all of the, and I'm going to use quotes here, indemnity provisions. Because the indemnity provisions, as you all know the language, really transposed it into a contribution clause, okay, because the sub, such as Joliet, Steele, was required to indemnify Power, but only for losses arising out of Joliet, Steele's work or resulting from operations. I'm not sure I understand what you're saying here. Yes. Therefore, that makes it a contribution. The first step, again, I'm trying to break the steps on it. The Court said that kind of language indicates a waiver of a Cotechi protection, right? Yes. That's what those cases say. They don't move on and say that means, therefore, this contribution. The cases seem to say when there's this indemnification language, it can only mean because of the anti-indemnification statute that, therefore, the employer was waiving any protection and would, therefore, be open to complete liability, right? That is true. I do believe there are cases, though, that actually the language, that type of language in an indemnification provision is actually a call for contribution. I think that's the exact language, and don't ask me to quote the case because I don't know. But at any rate, when an indemnification provision requests indemnity, but only to the extent of losses arising out of the sub's work, that is contribution. Why is it contribution? Let me take you back a couple of different places. Okay. Let's look at the Cincinnati policy, okay? Yes. Number one, there's an exclusion for coverage for Joliet's employee aspect of it, right? Correct? Yes. Also, the specific coverage for power is only for its vicarious liability. Is that true? Well, I would, to the extent that the additional insured endorsement specifically limits coverage to liability arising out of Joliet Steel's work or operations performed by Joliet Steel, yes. And that's all we have, right? That's all we have. So wouldn't you, can we agree, this policy that was purchased only protected power for claims against it for its vicarious liability? I would agree. Well, to the extent you're saying, I'm a little troubled by the term vicarious liability. Well, all right, for not its direct liability, but rather for liability that arises out of someone else's conduct. Yes. And we know that that can only be the kind of insurance you can have or only kind of indemnification because of the Anti-Indemnification Act, right? That's correct. You couldn't have a contract that says we're going, even in Kehoe, a million years ago when I wrote Kehoe, it's not that long after Kentucky, and the contract's still set. Yes. We will insure you or we will indemnify you for your own negligence. Right. They don't say that anymore. This one, the contract doesn't say that, and the policy doesn't say that, right? It's just saying we will get insurance for you for specifically your, I'm calling it vicarious, your secondary is another kind of expression, liability, correct? Correct. And that is my point exactly, and that is Joliet Steele's position, that in all of the contracts, when the intent is clear that Joliet Steele only agreed and power understood that they would only be getting protection for losses arising out of Joliet Steele's work. And, in fact, power, when they filed their third-party complaint for contribution, only sought contribution. So why does it seek contribution? That's my next question. So power filed a complaint for contribution. Yes. Correct? Contribution, the Joint Tort Profit and Contribution Act, provides for pro rata share of a common liability, correct? Correct. What is the common liability here? In this case, the common liability and what was, well, the jury was never told what it was because they just apportioned the fault, but it was $2.673 million. I don't need a number. I asked you what was the common liability. The amount of the settlement. How were they liable? A much more basic question. How did they share liability? How did Joliet and power share liability? How are they joint tort cases? I'll tell you where I'm going. You look confused. I'm confused. I keep saying to my friend here, if you speak Greek, please help with this case. So these are genuine questions, okay? And I'm kind of just trying to make my way through it, okay? We understand this insurance is about secondary liability, correct? If power paid $1 million from this insurance policy, funded by the insurance policy, for its secondary liability, then how does it have contribution rights, that is a common liability, not secondary liability, with Joliet Steel? Well, because power's total, you know, I'm going to use the word losses here because it was the total settlement, was $2.673 million. So Joliet Steel's carrier paid the $1 million, and then... What did they pay the $1 million for? Well, it would be Joliet Steel's position that they paid it for losses arising out of Joliet Steel's work. Okay. And so... Let's start there. So the only way we can understand this, that you and I understand this so far, is that the policy paid out for secondary liability, correct? Yes, that's all it covered. Can there be contribution rights for a defendant who has only secondary liability with contribution rights in another third-party defendant who has direct liability? If I'm understanding your question correctly, because there's so many, you know, ancillary issues here, and truthfully, I didn't even bring them up, like issues of subrogation and because it was the same insurer and all that stuff, so it was just a morass of problems. But anyway, I think that what you're saying is that where the insurance protected the third-party plaintiff, even if it was for liability arising out of the third-party defendant's work or acts or conduct, in Bursino, if the insurance fully protected it, then that's it. You cannot get any contribution. But in this case, and in current such with the Jimmy case, where the insurance does not fully protect, then power in any other third-party plaintiff would have the right to seek contribution beyond that policy. If, in fact, the apportionment, if, in fact, Joliet-Steele's liability, pro rata share of liability, was found to be more than the million dollars. Maybe I'll put this, how can there be pro rata share of power's secondary liability comparing it to Joliet-Steele's primary liability? How can there be a pro rata share of that? I'm just really sorry. I'm just totally missing your question here. I really am. I don't, I think we're way off. None of the cases we've talked about, except maybe Diaz a little bit, we haven't talked about that, but that case, have this idea of vicarious liability or secondary liability and direct liability. They don't talk about the policies, how the insurance policies are structured. They don't really, maybe some of them talk about the contract language, but they don't implicate these ideas of secondary liability and primary liability. But our case does because we know our contract, the contract we're talking about here, provides for indemnification insurance for secondary liability. And we know that the insurance policy only covers secondary liability. So don't we have to figure out how in our case those distinct ideas, secondary liability, primary liability, indemnification, contribution, how those ideas work together? No? Well, I don't see the conundrum that apparently you are having here. I mean, I'm not even close. You know, I thought that this whole system was that the bad guy pays the most. And if there's more than one bad guy, then the jury or somebody can say, okay, here's this injury or this bad thing that happened. You, defendant A, are responsible for this percentage of it, and you, defendant B, are responsible for this, or however many there are, and in most of these cases there's probably eight or ten. That's what's right. And, you know, I have a theory. My theory is that in all these cases, the last thing in the world the lawyers want is some law. Because today they're here, and about 80, you know, next month they're over here. I'm being facetious. But it is difficult for me to file. I'm having the same problem that Justice Stasis. What does, and then we get into the whole thing about whether it's sustainable. You know, I mean, let's throw in a little bit more. Well, the thing is, you know, those of us attorneys who deal with construction cases on a regular basis, we see this all the time. And I've encountered this problem all the time, and I was shocked that there wasn't a decision directly on point. But all the time. Justice Stasis says the lawyers don't really want law, so maybe that's why there's. Maybe that's why there's. They're about to get it over with. Since you brought all these issues to us, to sort this out, there's going to be something. Can we talk. Am I wrong? That's kind of the procedure that here's this injury. Now let's determine who's responsible for that injury. And now we determine responsibility, i.e., apportioning the amount. Now the next thing is, how are those parties going to pay that amount? Are they going to pay it with insurance? Or are they going to say, Joe down the street, who isn't even a party to this settlement, which I think we have here, don't we? We're going after them because they should be contributing to this. Well, see if you can explain it to me. Let's say in the famous Jimmy case. Yes. Okay. Famous Jimmy case. I probably have it right here tabbed. Oh, there it is. The court says, Jimmy may seek contribution from Steele to the extent of its 50 percent loss. $50,000. $50,000. I'm sorry. $50,000 loss. It's Jimmy's $50,000 loss. Right? Now if you take just that sentence out of it, there it is. That is our controlling question right here. Why? So there's going to be another trial. The case is going to be sent back down for a contribution trial. Right? So what happened in that trial? Was there pro rata distribution between the two parties, Jimmy and Steele, against the $50,000 loss? Or would there be a contribution trial, percentages determined, and those percentages against the $275,000 that they originally paid? Okay. I actually know the attorneys involved in the Jimmy case, and it never went to trial, unfortunately. They settled. But the only way that it could work out in a trial is that if it was an apportionment based on the total common liability of $275,000. Why? Well, because that's what case law says. No, it doesn't. It says, Jimmy may seek contribution from Steele to the extent of its $50,000 loss. I know, but in contribution trials, I think Ziarco is the case, it said the total common liability is the total amount of the settlement, and the jury does not know what that amount is. And Ziarco, I don't have that in front of me right now. I know. Is there an insurance policy piece that's taken out of it? I don't know. I don't think so. No. So forget that. Yeah, forget it. I'm trying to hold on to something. All right. This, at least Jimmy, the famous Jimmy case, says, all right, we agree insurance is going to cover the first part, and then there's going to be a contribution trial to the extent of the $50,000 loss. Why don't we read that to say, go decide 2575 and apply that against its $50,000 loss? Because then Jimmy, was Jimmy the third? No, Steele. Who was the third party defendant in that case? Steele. Steele. If that's how it was, Steele would be paying not only $225,000 of the 275, but it would also be paying, if there was any share of liability on its part, an additional. No, the insurance paid $225,000. $225,000 of the 275. Right. So if it went to trial on just the $50,000, first of all, it's not like contribution trials have the dollar amount. You know, the jury apportions, just like they did in this case, without knowing it was 2.673, and they said it was 35% Joliet-Steele, 65% power. And, you know, when you sort those percentages out, Joliet-Steele is responsible for $935,550. If you apply those numbers against the $2.7 million settlement, I'm asking why you would do it that way. Why not do what Jimmy says? Because then, if that's what, because, and this is, that's plaintiff's position. We're going to, you should pay your 35% of the 1.673 that was not covered by the insurance. Well, that flies in the face of Burcino, which even the Jimmy case acknowledged. Remember, in Burcino, insurance covered 100%. I know, but Jimmy, the Jimmy case recognizes, though, it says. And Jimmy says, okay. Based on Burcino. Here's, I'm real simple, and my math is hideous. And mine too. I've got charts all over the place. But my understanding, they're saying $2.75, insurance paid $2.25, I can do this, $50,000 left. Go back and have a contribution trial to the extent of the $50,000. That's what they say. No, it said, that's what they say. Here's what it says. It says Jimmy may seek contribution to the extent of its $50,000 loss. That means that if a jury apportions the fault in a manner where Steele's pro rata share would exceed $225,000, let's say Steele was found, oh God, here I'm going to have to do math, 90% at fault. And I'm going to make up these numbers a little bit. 90% at fault. Their pro rata share would be, let's say, $250,000. So Steele would have to pay another $25,000 to Jimmy. It doesn't mean that Steele's going to have to pay the whole $50,000. No, no, no. I didn't say that. There would be a trial, 90%, 10%, and the 90%, 10% would be applied against the $50,000 loss. Because then the third party defendant is paying first with insurance and then out of its own pocket. And that Brasino says, you've got to look solely to the insurance. Kehoe says, you've got to look at the party's intent. What did they intend? And in this case, the party's intended for Joliet Steele to pay only the losses arising out of its work. The court, or the trial, the jury in the trial, found that Joliet Steele's liability is 35%. $935,000 and some odd dollars. The million dollar insurance policy it provided, it purchased, it paid the premiums. That is the first line of protection. That protected power for Joliet Steele's conduct, negligence, what we did wrong. Okay? We're not paying. We never agreed to pay for what Power did wrong, that 65%. Okay? We never agreed. Back down to the secondary liability, primary liability. Right. And we know what we said. So let's, we know nothing about the contribution trial. What's that? The contribution trial is not in our record at all. So was the contribution trial about Power's secondary liability or direct liability? The trial was about, really, neither. It was about who, what percentage of fault. Somebody stood up and said, ladies and gentlemen of the jury. Yes. This is what Power did. This, this, this, and this. Yes. The other guy said this is what Joliet did. This, this, this, and this. Right. And the jury said, well, because they did these specific things and they did this, we're going to say 65%. Right. That's what happened. All right. The this, this, and this. Was this Power entered into a contract with a subcontractor and retained sufficient control that it is liable for Joliet's conduct? Or was the trial, Power directly was responsible by having a duty to supervise, a duty to train, et cetera, et cetera. What was the case about? The case was about really sort of a mishmash of those things. You know, that, I don't know. I know where you're coming from. The 414, the retained control. It was that and it was, you know, you didn't supervise, you didn't provide a safe workplace. Basically, you didn't provide a safe workplace because, you know, I mean, Mr. Monsheim. But directly or vicariously? I mean, that's a really simple, narrow question. That's what I'd like to know. Was it Power's direct action or activity or Power as being responsible for somebody else's? Don't we have to know? Don't we have to know that? That's really important to me. I'm not sure. No. I don't know why. No, I really don't see why the relevance of that. If they were deemed to be directly, I don't. Because ultimately. That's probably not a good thing to say to us, Counsel. That's probably not a good thing for you to say. Well. Go on. No, I mean, with all due respect, really. We look at all of this, so I think it's really inappropriate for you to tell us what you don't think is relevant for us to look at in trying to resolve this case. No, I did not. Certainly did not mean to imply that at all. But what I'm looking at is that, you know, ultimately Power was responsible or paid the 2.673 and then sought contribution from Joliet Steel for Joliet Steel's share of liability. And I know. Share of liability. If one is vicariously liable only, how can they share in the direct liability? Are you familiar with the case of Virginia Surety? Neither one of you cited it. It's the Supreme Court's most recent statement on all of these ideas. Neither one of you cited it. I wasn't going to bring it up to sandbag you now, but I'm just telling you, the Supreme Court has spoken on all this, and neither one of you told us about it. But we've got wonderful clerks. They found it. You know what? Maybe I found it myself. It wasn't that hard to find. The Supreme Court's most recent statement on all of these ideas. And one of the things the Court says is that the idea of indemnification for vicarious liability is 180 degrees different, they don't put it that way, but totally different from contribution, where parties share liability or their direct liability, two totally different ideas. And that's what we're struggling with, because you're not really giving us any ideas of how to work with that. Well, you know, unfortunately, I wasn't the trial lawyer, okay? I didn't try the contribution case, all right? But I can tell you that powers duties and obligations, to some extent, were based on its own direct liability as the general contractor. We know the insurance policy didn't pay for that. Well, Joliet Steel's insurance policy paid for a million dollars. No, Cincinnati did not pay for powers direct liability, correct? All I know is that power paid a total of $2.673, whether it was for their direct, vicarious. It wasn't even additional because the case settled. How could the Cincinnati policy that said we will only cover your liability arising out of someone else's conduct pay for direct liability? Well, because somebody at the insurance company determined that they would defend power without reservation. And so they did. And how? And they paid. And they paid. You know, I think when a case settles, I mean, nobody's thinking, oh, are we paying this money because it's direct liability or because it's vicarious liability? They're paying it because they believe there's some liability. And I think when the case went to the trial on the contribution claim, it was focused on Joliet Steel's liability and Joliet Steel's pro rata share. And so I'm so sorry I offended you. I certainly did not mean that at all because I totally respect, obviously, all courts and all justices. But, you know, it was just an idea that I never really thought of because I'm looking at it from the point of it was a settlement and their liability was never pinpointed and it really didn't matter, obviously. Why don't we hear from your opponent? I'm sure we'll have an interesting discussion. And I knew this was going to happen. I was never even going to get to the assignment argument. We'll get there. Believe me, because when I told you that I gave you half an hour, I run the clock. So you'll have an opportunity to answer these other questions. So let's hear from your opponent. Thank you. Good afternoon. Still good morning, Your Honors. I'm not sure which way we're going here. Jay Luxinger on behalf of Mr. Monshon, the assignee of power contractors and counsel. And may it please this Honorable Court. I'll start with a little background. I did try that case. And in that case, the allegations were that there was a construction job site, Loyola University up on the north side, and they were building a new building. Power was the general contractor. They had all the contracts. They hired all the subs. There was a well of some sort that had a hole. Power removed the well and left the hole. It was Power's hole. Then when Joliet Steel, who was hired by the subcontractor, came on board to erect the steel, they gave Joliet this area as a lay-down ground for their structural steel. The hole was still there. The structural steel then covered up the hole, not covering it to protect it, covered up so you couldn't see it. Mr. Monshon, a hard-working journeyman ironworker, when he was down there doing his job, he stepped in the hole. So we alleged, and the whole case was about, hey, Power, you're directly in charge of the whole site. It's a combination of direct liability and vicarious liability from our standpoint. It was your hole. You knew it was there. They admitted it. That once you gave it to, that hole should have been covered before you ever gave it to the erector. But once the erector got it against the lay-down area, there's nothing there. They had every opportunity in their own form and testified. Yeah, we had every opportunity to know the hole was there. I can't remember if he said he did know, but they had every opportunity to know, and then they covered it up. So both sides, we alleged, were responsible for having that hole there. Now, the respectfully to counsel, and she's been an eminently tough fighter throughout this entire case, and I respectfully suggest, though, that when she started, when counsel started her argument, the first statement she made to this honorable court was that the Cincinnati policy paid for Joliet's contribution responsibilities. Yet, the very first sentence of the reply says, Joliet Steel does not contend that the CGL policy purchased from Cincinnati covers its contribution liability in this case. So that's a bit of a contradiction. And I agree with this statement of counsel in the reply brief. As Your Honor aptly pointed out, when you look at the clear language, you know, once again, we're talking about looking at the contractual language. Well, the policies themselves are part of the contracts for this job site. In fact, the contracts required that the power be named as an additional insurer, that it have a Cincinnati policy that expressly stated that it was to cover power. It was to cover power. In fact, Your Honor, again, correctly pointed out to the exclusion in the Cincinnati policy that stated, this insurance does not apply to the employer's, Joliet's liability, bodily injury to Joliet's employee of the insured arising out of or in the course of employment by the insured or performing duties related to the conduct of the insured's business. That policy, Joliet knew that the Cincinnati policy was to cover power. That's why they went out and got this United Heartland policy, which we quote on the very next page of our brief, which does apply to the contribution. Now, one of the ironies here is that when we got to the point where we negotiated a settlement in the case and we took the position, hey, Joliet, United Heartland, you should forgive part of your lien because you have some responsibility here. They said, no, we will not forgive a penny of the lien. They got back United Heartland, the only company that would not participate in the settlement. They received upwards of about $500,000 back. The very company is saying now that their contribution liability has been extinguished by a policy of Cincinnati insurance that had nothing to do with that. So those are some of the issues we have here. And I believe that there's no way around that contractual language. The settlement of 2.7 plus the assignment, the assignment was part of the consideration for the settlement. Without the assignment, there probably was no settlement. We're going to trial on the whole thing. But that 2.7 was powers insurers paying for powers portion of its responsibility. And then we received, as part of the consideration, the assignment of powers right to contribution, which we then went to trial and tried. So the contractual language is clear as a bell. And that's why in terms of the Kern's case, the Jimmy case, where the Court states, and Your Honor had the quote directly on point. Jimmy may seek contribution from Steele to the extent of its $50,000 loss. Okay. How does that work? If the totality of the loss here is $200,000, $2.7 million at this point, the 35% of that $2.7 million is about $900,000 plus. That's what Joliet's, that's what United Heartland must pay. Now, even if one was to presume or find that there was some sort of a cap based on this million-dollar policy of Cincinnati, which, by the way, has never been argued by the other side in this case. I mean, that's never been argued before this Honorable Court. But even if one was to assume for purposes of trying to assume it that. We're trying to figure this all out. Fair enough. If you take the language in Jimmy that you can, the contractor in that case could ask for damages to the extent of its $50,000 loss, I would say that the apportionment would be, that number is $275,000, two and a quarter was paid. The apportionment would be whatever percentage of that 275, but they'd only get the 50. In other words, if there's 50. Okay. So you think the percentage, the numbers, the 65, 35 in Jimmy, let's say, would go against the $275,000? It would go against the $275,000, but the company that's seeking the contribution can only receive the 50 because they got that two and a quarter. Now, in this case. New math. That is a totally new math. In this case, our position is that, one, the Cincinnati policy paid for powers liability. The company that is responsible for the contribution is United Heartland. In this case, power pursuant to Jimmy, the Trinchet's case, power can seek contribution to the extent of 1.6, whatever the rest of the number is. That is more than the 935. The United Heartland is responsible for the entire $935,000, which the jury decided, the jury with a full jury trial under Judge Elrod, the jury decided that 35% of the 2.7 million would have 35% of the total liability. They never knew the number 2.7, but 35% of that 2.7 million would be the responsibility of Joliet Steel. That is United Heartland. That's who's responsible here. Could you help me just on this piece now? Sure. This is my idea about vicarious liability, indemnification, direct liability, contribution. Different ideas. Okay. Would you agree with that? Yes. Well, they're different ideas, although they certainly overlap and interplay. And that's where I want you to help me do this. All right. So Cincinnati paid only, it could only pay for Powers' secondary liability, correct? Well, I would say, and I'm not trying to be coy here in any way, Your Honor. I'd say yes and no. They don't, here's why I say this. They don't just pay for Powers' secondary liability. They pay for both. Powers had secondary. How could they do that when the policy says it will only pay for vicarious liability? How could the policy do that? How could it cover both? Because, in my view, and I may be very flawed here, the power is liable directly here because they let that hole be there. And it's not like we're just off on the side and we weren't paying attention. It was their hole. But even if you assume that we're just talking about this particular policy, doesn't the language of the policy dictate specifically what it will cover? Well, Your Honor, it says what it will cover, then it has exclusions. And oftentimes, and I'm certainly beat because I do only plaintiff's work, I am constantly mystified at the intricacies of insurance law when, in every case that we encounter, we're constantly seeing defendants jockeying to figure out whose policy has to be tendered. Whose policy has to be tendered. It says we will only cover what I'm shorthanding as secondary liability. We'll only cover power for the liability arising out of the Conduct Control Act. That sounds to me like vicarious secondary liability. How can we read that and interpret it in any other manner than to say that the $1 million was paid for liability that is secondary?  I think that there has been a, I don't want to use the word confusion. I want to put it this way. Well, you can use the word confusion. When a contract in this case says that this Cincinnati policy is going to apply to work arising out of Joliet Steel's operations? Liability. Okay, liability, pardon me, arising out of Joliet Steel's operations. That doesn't mean that it means it's only going to pay for liability that was caused by Joliet Steel. Here's why. Because if I'm the general contractor and I have subs all over the place, I've got an erector, I've got a cement finisher, I've got an excavator, I get me Cincinnati policy. That policy covers me for any, me and the erector are doing this together. The erection work is my work, I'm the general, and it's his work or her work. So the work that we do together, if a liability arises out of that work, the Cincinnati policy kicks in. But I'm doing work together with a cement finisher or an excavator. If someone gets hurt in that work and I'm responsible and perhaps that sub is responsible, the Cincinnati policy isn't going to have to kick in because it's not arising out of that work. All right. So a rising case that isn't, let's remember, this is a much litigated issue. Duty to defend does, I mean, right now, I don't know if you folks are aware of this, there are, I don't know what it is, four or five competing cases from the appellate courts in different districts. This is a firestorm issue and a duty to defend idea. Early on, the insurance companies say we have no duty to defend because our policy is drafted only to cover secondary liability. And people are trying to sort this idea out before we get to where we are today in our case. Our case is really right at the end. There's a ton of cases going on right now trying to sort this out right at the beginning of the case. What does this policy cover? And there's an awful lot of law about this language, very similar to what we have in our policy, being interpreted in those other kind of cases. And they generally interpret them to mean this idea of vicarious or secondary liability versus direct liability. I can't speak to the greater body of law in that fashion, Your Honor. I'm going to confess that that is not something that I have mastered. But I would say this. A reasonable reading, and the reading that I take from it as an attorney, and someone's done this for 20 years, is that exactly what I suggested a few minutes ago, is that when we have overlapping scopes of work, if I become liable, me the general contractor, for operations that arise out of one of my sub's work, then it doesn't mean I'm responsible for their negligence necessarily. That would be a vicarious issue. But I can be directly liable for work, for liability that arises out of someone else's work. Certainly, I mean, would you be doing this? You must see motions to dismiss, where the general comes in and says, we have no duty to you. You see motions like MSGs all the time. The restatement 414. Right. That's your life's work, I'm sure. You do this all the time. So you see these cases where they're talking about, what is the relationship between the general and the sub, right? Is this the big fight that goes on in all your cases all the time? Absolutely, Your Honor. And I would suggest this. My experience has been, and I know the Cochran case very well, which has now been on the books for some years, and it talks about vicarious liability versus direct liability, that in those cases where the general contractor or the construction manager's work is most distant from the scope of work that ends up or the actions that end up causing an injury to a worker, those are the vicarious liability type cases. That's where I see an MSJ most often. Where I see cases like this, if I may say suggest, where the general contractor's got his hand or her hand directly in the problem, the unsafe condition, I never see an MSJ, or very seldom, because it's just a ghost. What you're suggesting is that the policy language doesn't mean what it says. And I find, well, knowing insurance companies, it seems like they would be as specific as they can, so the policy language would mean what the policy language means. And your explanation is basically saying, well, I know what the policy language says, but it doesn't really mean that. May I just ask, Your Honor, if it's appropriate, are you speaking to this arising out of issue? Because I've seen no case, certainly no case cited by a defendant in this case, that equates the term arising out of with directly attributable to you. I'm just speaking about vicarious liability as the term is commonly understood by all lawyers and everybody who have anything to do with the law. That's all I'm speaking about. And as I understand, like, well, and I hope I'm speaking to your question, Your Honor, but vicarious liability as it applies to an insurance contract, I would say that that would mean that you're going to take liability for someone else's actions. Yes. Okay. And that's certainly, I understand that that's what we mean by vicarious liability. In this case, when we apply it to that, that's why I said earlier my answer to the question was yes and no. You have a situation where the general contractor, we believe, was responsible vicariously for the fact that Joliet Steel failed to cover that hole, but they were also directly responsible for the fact that they gave an open hole to a subcontractor and didn't cover it themselves. But they could not provide insurance to power to cover power for that direct liability. They could not do that. That would violate the anti-indemnification case. Folks, we're all struggling with this. You've all, you're wonderful lawyers, and you're very engaged in these things, and you've written provocative briefs, and you've had new arguments here. We have to write an opinion, and we've got to find a way to bring together all of these ideas that we all agree no other case has done. And the reason why we're spending this 45 minutes is that we are struggling to find an answer so that we can write a cogent opinion so that in the future lawyers like you and companies like Power and Joliet can, you know, how their behavior is going to be driven after we write this opinion. So we're struggling. We're desperate to find the right answer because that's what our job is all about. May I offer one suggestion? It seems to me that given the limitations of the Anti-Indemnification Act and the parameters that are out there with regard to that, perhaps my characterization of direct liability as direct liability, if it can't work because it contradicts the Anti-Indemnification Statute, then perhaps my characterization, even though I call it direct liability, must be construed or at least interpreted or characterized from a legal framework as vicarious liability. We're stuck with this legal framework. That's the nature of our lives. I'm sure both of you are wonderful in front of juries. We just struggle with legal framework. Let me give you some time. We're sitting here all day. Thank you. This is an honor, honestly. Let's talk about the assignment issue. Okay? Let's talk about the assignment issue. Okay? Now, to me, I think the assignment issue is the easier of the two basic issues here. We have your basic law. We'll be the judge of that. Of course you will. Yes, Your Honor. At least we understand the words. The Blatt case is on all fours in that instance. The dissent in Claudie is also cogent. But I want to start at the beginning, if I may briefly, is that keep in mind that this case went on for years and years and years before there was ever any objection to the assignment. We settled the case and there was no objection to the assignment. We went in on a motion to make sure that it was a just and fair settlement. There was no objection to the assignment. We went in a second time. There was no objection to the assignment. That issue, to keep it simple or simplest, is waived. But if it's not waived, if we look at Blatt, of course you can assign to a non-tortfeasor. That's what the case law says. And if we look at Claudie, by the way, the clear language in Claudie says that, hold it, if you weren't part of the settlement arrangement, and I have the quote, if Your Honor would like, if you weren't part of the settlement arrangement, you can't object. You don't have standing to object to the mutuality of the agreement. So keeping in mind that Mr. Weiss, the lawyer, the fine lawyer who represented Power, in all of the releases, he signs it for Power and its insurers. And then in the confirmation of the assignment that was filed at one point in time, he makes it crystal clear, as a lawyer, I'm representing Cincinnati Insurance for Power. I'm representing Power's insurance companies. So it's clear as a bell that the companies that settled this case, Power, Lindahl, and all their insurance companies, all signed off on the assignment. They didn't really sign off. Pardon me. Through their attorney, they signed off. And they were all present at the mediation where we reached the agreement, and there's never been – Is there anything in the record? What's our record on that? The record is if we look at the release, we'll see that the insurers, it says Power and its insurers, both releases. If we look at the confirmation of assignment document that was filed to clear up any ambiguities, Mr. Weiss signing for Power enlists every single insurance company. They were all present, and at this point in time, no company that was part of this settlement has ever come forward and challenged the assignment. So the case law is crystal clear. You can assign to a non-tortfeasor. You can assign to a non-tortfeasor after the settlement. I believe that's the – I want to say the – We'll find it. This assignment provision, which I think is in all those confirmation documents, the second confirmation, that was part of the deal. Yes. That's part of the settlement. Yes. We want – Manchin says, I want – not only do I want this cash, but I want the right to go after whoever for contribution. Yeah, the company that said give me back my 500K. Is that all part of the deal? Everybody was aware of it. Yes, Your Honor. Okay. So that's – I think it's crystal clear that the assignment was proper. It was legal. It's never been contested by anyone who participated in it. The only company that – Yes, Your Honor. Sorry. No, no. And that's why we claim its weight, and I will say thank you very much for the time you gave me and the counsel. I appreciate it. Thank you very much. And thank you, as I said, thank both of you, because ultimately in a moment the ball will be in our court literally, and we will have to make some sense out of all this. So we thank you for the help that you've given us in your advocacy here. And obviously, lastly, we pray that you will affirm the trial court's judgment and ruling in the lower court. Thank you very much.  Briefly, but, of course, we want you to address the assignment issue. Yes, thank you. On the assignment issue, our position was always that, you know, under Section 2F of the Contribution Act, the insurers became segregated to powers right to contribution. Who are you to raise that? That's what I don't get. I'm sorry? Who are you to raise that? I mean, you know, if Cincinnati had some problem, why aren't they here? Well, I was the one to raise it because I was the one being sued. Joliet still was the one being sued. And power was not the proper entity. The real party in interest was their insurers. And so I think it's the they're pretty dependent. If they're here to object, they're happy, apparently. So that's my question. You're saying that Cincinnati never agreed. Well, what I'm saying is that when the, you know, after the settlement was finalized and the assigned claim proceeded, you know, I did a motion to dismiss saying that the real party in interest was not a part of was not bringing the action, and they should have, and that real party in interest being the insurers. And I think that, you know, I mean, there are other cases, you know, Prudential versus Romanelli was the same. There's Prudential. Don't we see this in every single contribution case? It comes in the name of the company, the real or whoever, the defendant, a real, not a human being, but at least most of the cases are not, contribution cases are not, you know, Aetna versus so-and-so or Cincinnati versus so-and-so. They're Power versus Joliet Steel. That's how we see the cases all the time. I know, and I've had this discussion with so many attorneys for, you know, for decades, and, you know, Judge Maddox, you know, said it's always been like that. It's always been the construction company or whatever versus the third-party defendant. But in Prudential, and I think if you apply Section 2.5. So there's a Prudential case out there, but you agree that every other single case that we see in contribution is framed exactly what we have here. Well, that's not technically true. I do know of some cases where, in fact, it has been, you know, I was involved in a case, Uonic, where it was the insurer as subrogee of the construction company. Be that as it may, you know, I think under 2F, this was my, you know, Joliet Steel's position, under 2F of the Contribution Act, the insurers became subrogated to powers rights, whether or not they were on the caption or not, and they were the only ones who could have assigned this, the contribution claim, and. What about the document that was filed in response to your motion to dismiss, the confirmation saying, we were there, we're the lawyers, as an office of the court, I am the lawyer for Cincinnati, and this is what they want. I know, but it wasn't just Cincinnati. It was just the attorney for Cincinnati. Well, the attorney doesn't say that. Well, what about. The attorney says, I'm an office of the court, and I'm telling you, I'm paraphrasing, Cincinnati gave me authority to do this. Okay. What do we do with that? I'm going to say two things. One, the settlement agreement was not signed by the attorneys, okay, neither the original nor the revised. It was signed by powers, chief executive officer, okay. And it says power and it's insurers. Well, no, it said power was defined to include its insurer, but I mean, if you were going to say. But that's hair splitting. I mean, the intent of the document makes it clear that it's not just power, but it's insurers all. Do you disagree with that? That's what the document says. I do, because it's the only place that insurers put in that settlement agreement is in the definition. And if you're going to say that everybody in the definition. I want to ensure that we're not having the very dispute that we're having here, so that they would, whoever reads that document, would assume or understand it means power and it's insured. I would assume that that's why they put that in there. Well, look, this is what I thought. You know, I truly believe that under the law, the insurers are the real parties in interest. And there's no indication on that document, on the original, the revised, the confirmation, that they ever even saw any of those, that they agreed to it. You know, the one attorney was there, but that confirmation of assignment was months after the case was dismissed. And I just don't know that an attorney can bind an insurer that it's not even representing it's insured anymore. But I am going to just wrap up the assignment argument and just, if I could, have a minute to go back to the, you know, what I like to call the prosceno issue. And the way that I looked at it was really just what did the parties intend to happen? Okay. And I think if you just look at the construction contracts, Joliet and Power understood and agreed that Joliet Steel would protect Power only for losses arising out of Joliet Steel's work. Okay. Joliet Steel's position is that the insurance it purchased and the premium that it paid for, that insurance, did cover, did fulfill the intent of the parties' agreement because it covered Power to the extent of Joliet Steel's pro rata share of liability. If the percentages had been reversed and Joliet Steel's liability had been 65%, meaning Joliet Steel was responsible for $1.7 million of the total common liability, I would agree that Joliet Steel would have to pay Power another $700,000, but not another $1.7 or not another, you know, because that $1 million. And I was going to just read you something really quick from Monocle, the Monocle case. The court there said, We find the parties manifested the intention that the insurance provided by Jobst on behalf of State Farm was to protect against any personal liability to Jobst as well as State Farm. We cannot believe that Jobst would intend the insurance for any other purpose than to protect itself from a suit such as this. And I think that is exactly the situation we have here. Joliet Steel purchased that insurance not only to protect Power but to protect itself. And I think in doing so, it must get credit for that $1 million, otherwise it's paying Power twice for the same loss. I thank you all so much. Thank you very much. This case will be taken under advisement.